# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 3, 2011

No. 09-30971

Lyle W. Cayce
Clerk

DARRIN KENNY LEWIS, SR., Individually and as Natural Tutor of His
Minor Children, A and B,

Plaintiff-Appellant

v.

ASCENSION PARISH SCHOOL BOARD,

Defendant-Appellee

---

Appeal from the United States District Court
for the Middle District of Louisiana

---

Before JONES, Chief Judge, and KING and HAYNES, Circuit Judges.

PER CURIAM:

In this equal protection case, Darrin Lewis appeals from a grant of
summary judgment in favor of the Ascension Parish School Board in Louisiana.
The district court rejected Lewis's claim that the School Board's student
assignment plan, formulated to address school population changes while
"maintaining the district's unitary status," was impermissibly race-based and
discriminatory against minority elementary, middle, and high school students
zoned for East Ascension High School. We affirm in part, reverse in part and
remand. Under the state of this record, we cannot determine whether the

district's plan must be subjected to strict or rational basis scrutiny. Further factual development is required.

## Background

The Ascension Parish School District operates four high schools in Southeast Louisiana—Donaldsonville High School on the west bank of the Mississippi River,[1] and East Ascension High School, Dutchtown High School, and St. Amant High School on the east bank. Since at least 1972, the District has assigned students to these schools through an attendance-zone-based "feeder plan," whereby specified elementary schools "feed" into specified middle schools, which in turn "feed" into one of the high schools. This organization allows students to matriculate together to middle school and high school.

In 2004, a federal district court dismissed the District's longstanding desegregation case and declared the District unitary after finding that all vestiges of the prior compulsory dual school system had been eliminated to the extent practicable.[2] The District was thereafter able to assign students within the school district as necessary pursuant to its authority under Louisiana Revised Statute § 17:81, but the District maintained its pre-unitary status feeder plan.

In 2006, the enrollment of Dutchtown Middle School, a Dutchtown High School feeder school, rose to over 1,000 students and caused severe overcrowding. No other East Bank middle school had more than 730 students enrolled. Consequently, the District's "Growth Impact Committee" was charged with developing a plan that would "address the growth with minimal impact on residents;" "ensure equal facilities and instructional quality for all children;" "attain enrollment maximums" established for the elementary, middle, and high

---

[1] Student assignments to Donaldsonville High School are not at issue in this appeal.

[2] See *Charles v. Ascension Parish Sch. Bd.*, Civil Action No. 65-3257 (M.D. La.).

No. 09-30971

school levels; and "maintain unitary status." Superintendent Donald Songy and district staff also began exploring various re-zoning options. According to Superintendent Songy, the District sought to move approximately 450 students from Dutchtown Middle School, and thus out of Dutchtown High School's feeder zone, to other East Bank schools with capacity for growth.

Scott Duplechein, the "demographics application specialist" with the District's Construction and Planning Department, originally prepared three alternative plans—Options 1, 2, and 3—using enrollment data from the District's "Edulog" software. According to Superintendent Songy, Edulog was used to "geographically code all students actually enrolled in the school system based on their physical residential addresses and to project the statistical effects of various rezoning options." From input during public hearings held by the Growth Impact Committee, the District also considered Options 2c, 2d, 2e, 2f—variations on Option 2—and a "Prairieville Option,"[3] all of which were formulated based upon Edulog data provided by Duplechein. Ultimately, the Ascension Parish School Board, which governs the District, narrowed its consideration down to Options 1, 2, 2f, and 3.

Summarizing Duplechein's proposals, Superintendent Songy put together a document entitled "Statistical Analysis of Options 1, 2, 2f and 3" and presented it to the School Board for consideration. The document listed the current enrollment, percentage of African-American students, and percentage of at-risk students at each school in the district, then projected the enrollment, percentage

---

[3] School Board member and Growth Impact Committee chairman Troy Gautreau gave a PowerPoint presentation to members of the public some time in 2007, detailing a "Duplessis Feeder Option" and a "Prairieville Feeder Option." According to Superintendent Songy, the "Duplessis Feeder Option" referred to Option 2 and the "Prairieville Feeder Option" referred to Option 3. Later, the District simultaneously considered both a "Prairieville Option" and an "Option 3," so it appears that Gautreau's "Prairieville Feeder Option" and the subsequently-considered "Prairieville Option" refer to two different plans.

No. 09-30971

of African-American students, and percentage of at-risk students at each school under each of the four options.[4]  These data were generated from Edulog.

At its January 15, 2008 meeting, School Board member Troy Gautreau discussed the School Board's redistricting efforts and, according to the meeting minutes, told the School Board and audience that "the criteria most concentrated on was [sic] maintaining our current unitary status with the Department of Justice and moving the least amount of kids as possible."  The School Board thereafter voted to adopt Option 2f.  Option 2f moved Duplessis Primary from the Dutchtown feeder zone to the East Ascension feeder zone, assigned two brand new primary schools to each of the high school feeder zones, and re-drew attendance zones so that students from the Dutchtown feeder zone and the St. Amant feeder zone were moved to the East Ascension feeder zone.

## Procedural History

Shortly after the adoption of Option 2f, Appellant Lewis, the father of two black schoolchildren assigned to East Ascension's feeder zone both pre- and post-Option 2f, filed this suit against the Appellee School Board in Louisiana state court.  Individually and on behalf of children "A" and "B," Lewis brought, *inter alia*, a 42 U.S.C. § 1983 action for violations of his children's Fourteenth Amendment rights to equal protection.[5]  Lewis claimed that the School Board's

---

[4] Before narrowing its options to 1, 2, 2f, and 3, the District had similarly compiled a document listing the projected minority and at-risk student percentages in each feeder zone under Options 2c, 2d, 2e, 2f, 3, and the Prairieville Option.  Gautreau's presentation of the Duplessis and Prairieville Options (*i.e.*, original Options 2 and 3), which emphasized "[m]aintain[ing] our Unitary Status with the Department of Justice," also compared each plan's projected effect on the percentages of black and white students and the percentages of at-risk students who would attend each affected school.

[5] Lewis's real property value diminution, Voting Rights Act, First Amendment free association, Title IX, and state law tort claims are not at issue in this appeal.

4

"actions since the construction of Dutchtown High School[6] and in the adoption of Plan 2f were taken to ensure that East Ascension High School [and its feeder schools] would maintain a disproportionately large non-white minority population, leaving the remaining two East Bank schools as predominantly white." He further alleged that, because Option 2f placed a disproportionate number of at-risk students[7] in the East Ascension feeder zone, Option 2f "would ensure that the non-white minority students at East Ascension High School [and in its feeder system] would not, now and in the future, be afforded educational opportunities equal to those available to the students at either Dutchtown High School or St. Amant High School."[8] Lewis does not suggest that at-risk students are a suspect class for equal protection purposes. His claim is that *minority students* are being discriminated against based upon their race by a disproportionate influx of at-risk students into their schools.

The School Board removed the action to federal court and filed a motion to dismiss or for summary judgment. Lewis responded but did not cross-move for summary judgment. The district court adopted the magistrate judge's Report

[6] Before Option 2f, the feeder plan was last modified in 2002, when Dutchtown High School opened to address population growth in the Dutchtown area of East Ascension Parish.

[7] "At-risk" students are those who are eligible for free or reduced-price lunch due to disadvantaged socioeconomic status.

[8] Lewis supports this claim with evidence that children who attend schools with high levels of low income students are at risk of low achievement regardless of their academic potential. As confirmation, he points to the School Performance Score data of each of the three feeder systems and notes that the schools in East Ascension's feeder zone, whose student populations have the highest levels of at-risk students, consistently score much lower than the schools in St. Amant's and Dutchtown's feeder zones. The magistrate judge dismissed these data as covering the years 2000-2007, but pre-Option 2f evidence that schools with high percentages of at-risk students suffered academically is relevant to the contention that Lewis's children will be damaged as a result of Option 2f's concentration of at-risk students in the East Ascension feeder zone. We need not and do not here find that higher percentages of at-risk students negatively impact the learning experience of the remaining students or the school environment as a whole. We recognize that there are high-achieving low-income students and low-achieving high-income students. We conclude only that Lewis has so stated and provided a plausible basis for considering this claim.

and Recommendation to grant the motion. Relevant to this appeal, the magistrate judge found that Lewis lacked standing to pursue claims on behalf of child A but did have standing as to child B. Further, the court found that, though Lewis's § 1983 claims based upon Option 2f's implementation were timely, his claims based upon the 2002 modification of the District's feeder plan[9] were prescribed. Finally, the court refused to apply strict scrutiny to the District's adoption of Option 2f. The court found the plan facially race neutral and that Lewis had not presented competent evidence of discriminatory motive by the School Board or disparate impact resulting from Option 2f. The magistrate judge determined that Option 2f satisfied rational basis review because the District had a legitimate government interest in alleviating school overcrowding. Lewis appeals.

## Standard of Review

The operative pleading was styled a "Motion to Dismiss and/or for Summary Judgment." The district court considered evidence outside the pleadings in granting the School Board's motion and treated it as a motion for summary judgment. "This court reviews the summary judgment *de novo*, applying the same standards as the district court." *DePree v. Saunders*, 588 F.3d 282, 286 (5th Cir. 2009) (citation omitted). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "On review of a grant of summary judgment, all facts and inferences must be construed in the light most favorable to the non-movant." *E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462, 469 (5th Cir. 2009) (citation omitted).

---

[9] *Supra,* n.6.

No. 09-30971

## Discussion

We address each appealed issue—standing as to child A, prescription of Lewis's claims based upon the 2002 feeder plan modification, and whether Option 2f violates the Fourteenth Amendment's equal protection clause—in turn.

### A.    Standing

The magistrate judge held that Lewis lacked standing to pursue claims on behalf of child A because, while Lewis produced a judgment and letters of tutorship indicating that he was confirmed as child A's natural tutor on June 2, 2009, he presented no evidence that he was child A's tutor at the time suit was filed on March 14, 2008.

We note that child A indisputably has standing as the party affected by the alleged wrongful redistricting. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571, 112 S. Ct. 2130, 2142 n.5 (1992). The problem is that child A, as a minor, lacks capacity to sue under Article 683 of the Louisiana Code of Civil Procedure. La. Code Civ. Pro. 683 ("An unemancipated minor does not have the procedural capacity to sue."). Unlike standing, the lack of which cannot be waived or cured, capacity to sue can be cured. Fed. Rule Civ. Pro. 17(c). *See* 6A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE (2010) § 1570, at 676 ("Defects in the appointment of a guardian under Rule 17(c) are not jurisdictional . . . especially when timely objection to the defective appointment would have permitted the mistake to be cured."); *Cf.  Scott v. Jack's Cookie Co.*, 413 So. 2d 1334 (La. App. 1982) (remanded to allow parent to cure capacity defect). Because we remand on other grounds, we vacate the district court's ruling on this matter and remand for consideration by the district court in the first instance as to whether to permit Lewis to cure his defective allegations of capacity. No one disputes that Lewis has standing (and capacity) to pursue equal protection claims on behalf of child B.

No. 09-30971

B.     *Prescription of 2002 Feeder Plan Modification Claim*

The magistrate judge found that Lewis's equal protection claims based upon the School Board's 2002 modification of its feeder plan were prescribed under the one-year statute of limitations applicable to § 1983 claims in Louisiana.[10] The court rejected Lewis's "continuing violation" theory, noting the requirement that Lewis show a "series of related acts, one or more of which falls within the limitations period." The court found that Lewis had presented no evidence that Option 2f, which fell within the limitations period, was related to the 2002 modification of the District's feeder system such that the latter claims survived prescription.

On appeal, Lewis has abandoned his continuing violation argument. Instead, he argues that he was not, nor should he have been, aware of the facts necessary to assert his claim based on the 2002 modification until public hearings were held in the summer or early fall of 2007. This argument is waived because it was not presented to the magistrate judge, see *Cupit v. Whitley*, 28 F.3d 532, 535 n.5 (5th Cir. 1994), and, alternatively, it fails on the merits. Lewis asserts that not until the 2007 hearings were data provided to the public regarding the 2002 modification's allocation of minorities and at-risk students to the East Ascension feeder zone. Nothing in the record supports that proposition. The district court correctly held that the 2002 feeder plan modification claims are time-barred.

C.     *Option 2f Equal Protection Claim*

To assess the constitutionality of the district's Option 2f districting, one must first understand Lewis's challenge to the plan. This opinion and the dissent agree that Lewis alleges minority students in the East Ascension feeder system were denied equal opportunity by the assignment of a disproportionate

---

[10] *See Bourdais v. New Orleans City*, 485 F.3d 294, 298 (5th Cir. 2007).

No. 09-30971

number of at-risk students to that system.[11]    Such assignments allegedly resulted in a denial of equal educational opportunities to children in East Ascension comparable to those available in the Dutchtown or St. Amant high schools.  Lewis also contends that Option 2f is automatically subject to strict scrutiny because it employs racial classifications and, alternatively, that he produced sufficient evidence that the Board had a discriminatory motive in assigning a disproportionate number of at-risk students to East Ascension, with corresponding evidence of disparate results.

In assessing Fourteenth Amendment equal protection challenges, the Supreme Court holds that "[a]ll racial classifications imposed by the government 'must be analyzed by a reviewing court under strict scrutiny.'" *Grutter v. Bollinger*, 539 U.S. 306, 326, 123 S. Ct. 2325, 2337 (2003) (quoting *Adarand Constructors, Inc., v. Pena*, 515 U.S. 200, 227, 115 S. Ct. 2097, 2113 (1995). This is because a "racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S. Ct. 2282, 2292 (1979) (citations omitted).  Strict scrutiny also applies to government action that is "ostensibly neutral," but only if the neutral law has a "disproportionately adverse effect" that "can be traced to a discriminatory purpose."  *Id.* at 272, 99 S. Ct. at 2292–93 (citations omitted).

If the government is found to have acted with a discriminatory purpose , strict scrutiny review places the burden on the government to prove that its actions are narrowly tailored to achieve a compelling government interest.  *See Gratz v. Bollinger*, 539 U.S. 244, 270, 123 S. Ct. 2411, 2427 (2003).  Absent a discriminatory purpose, its action is reviewed under the rational basis test.

---

[11] Chief Judge Jones's special concurrence contends that Lewis has also maintained a claim for "racial balancing" of the attendance zones based on the district's intent to preserve the same "demographics" in each feeder system that existed when the district was declared unitary.  The other panel members disagree that this argument is preserved.

No. 09-30971

The magistrate judge here found that because Option 2f is "race neutral" on its face, the critical questions are (1) whether the school board intended to discriminate racially and (2) whether the plan had racially disparate effects. *Washington v. Davis*, 426 U.S. 229, 96 S. Ct. 2040 (1976). In this context, an allegation that the Board knew there would be a disproportionate impact in the re-zoning is "only relevant to the extent that it 'reflects a discriminatory purpose.'" *Ricketts v. City of Columbia*, 36 F.3d 775, 781 (8th Cir. 1994), (quoting *Davis*, 426 US at 239). A discriminatory purpose, however, requires more than a mere "awareness of consequences." *Feeney*, 442 U.S. at 279, 99 S. Ct. at 2296.

Immediately following her recognition of these general principles, the magistrate judge referred to evidence in the record that the Board members and administrators all acted under the apprehension that "the reassignment option chosen could not upset the unitary status of those high schools." The magistrate judge goes on:

> Thus, it appears that, although the race of reassigned students was one of the factors considered when Option 2f was adopted, that factor was considered in an effort at *maintaining the racial balance* already existing among the schools in East Ascension Parish and in maintaining the school district's unitary status, not as part of a racially discriminatory motive designed to allocate a 'disproportionate number' of African-American students to the East Ascension school zone. (Emphasis added).

The court accordingly rejected the application of strict scrutiny to Option 2f because it "does not explicitly employ racial classifications" and the plan assigns students to schools based on their "geographical location."

We find the court's analysis troubling for two reasons. First, it is unclear how, on the record before us, the court could make a factual finding as a matter of law about the Board's lack of discriminatory purpose. Second, the court's assumption that it might be justifiable to use racially-based decisions for the

No. 09-30971

"benign" purpose of maintaining post-unitary "racial balance" among the schools in the system is at least in tension with the Supreme Court's decision in *Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 551 US 701, 127 S. Ct. 2738 (2007).[12]  In *Parents Involved*, the Court required strict scrutiny review for a racially-based student assignment decision in a Kentucky school district that had been declared unitary.  The Court held that preserving the district's unitary status by means of racially-based assignments, albeit a "benign" racial motive, was nevertheless constitutionally impermissible. *Parents Involved*, 551 U.S. at 721, 127 S. Ct. at 2752.  We need not parse *Parents Involved* further here, as we conclude that the following evidence created a genuine issue of material fact whether the Board acted with a racially discriminatory motive.

Superintendent Songy compiled, and the School Board considered, documentation detailing the percentage of black students that would be enrolled at each East Bank school under Option 2f.  The data were generated from software that coded *each* enrolled student in order to predict the "statistical effects" of Option 2f's boundary adjustments.  Indeed, it is unclear how a student assignment plan could calculate the percentage of black students at each school *without* classifying *individual* students by race.  The School Board insists that the Statistical Analysis underlying Option 2f—submitted by Lewis in opposition to summary judgment—does not constitute Option 2f itself.  But to accept that self-serving, summary allegation would be to allow a school district to skew

---

[12] To support its conclusion, the court actually relies on cases that all predate the *Parents Involved* decision. *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71 (1st Cir. 2004). *See also McDaniel v. Barressi*, 402 U.S. 39, 41, 91 S. Ct. 1287, 1288 (1971); *Tometz v. Bd. of Ed. Waukegan City Sch. Dist. No. 61,* 39 Ill.2d 593, 597–98, 237 N.E.2d 498, 501 (1968); *Offermann v. Nitkowski*, 378 F.2d 22, 24 (2d Cir. 1967); *Deal v. Cincinnati Bd. of Ed.,* 369 F.2d 55, 61 (6th Cir. 1966); *Springfield Sch. Comm. v. Barksdale*, 348 F.2d 261, 266 (1st Cir. 1965); *Penn. Human Relations Comm'n v. Chester Sch. Dist.*, 427 Pa. 157, 164, 233 A.2d 290, 294 (1967); *Booker v. Bd. of Ed. of Plainfield, Union Cty.,* 45 N.J. 161, 170–71, 212 A.2d 1, 6 (1965); *Jackson v. Pasadena City Sch. Dist.*, 59 Cal.2d 876, 881–82, 382 P.2d 878, 881–82 (1963).

reality simply by selectively including documents in the record and labeling only *those* documents its "plan."[13]  We decline to so elevate form over substance, especially where we are obliged to construe all facts in the light most favorable to Lewis and reject conclusory allegations in support of a motion for summary judgment.  *See Brock v. Chevron U.S.A., Inc.,* 976 F.2d 969, 970 (5th Cir. 1992).

The following testimony also suggests that the District relied upon the race of the individual students residing in different geographic locations when it re-zoned its schools:

1.   Deposition of Superintendent Donald Songy - "We had to make sure that in doing this, we did not, by this move, increase the minority, the black percentage at East Ascension High School . . . in all the plans we developed, we made sure that the move of the students did not increase that percentage."

2.   Deposition of School Board Member Ed Price - "[O]ur demographer started looking at the numbers, we wanted to see how we could best relieve overcrowding at Dutchtown High School and, of course, we looked at the majority and the minorities and see where we could best pull kids away in order to achieve that without basically upsetting the populace to where we could put more, you know, minority kids and majority kids and things like that."

3.   Deposition of School Board Member Jody Elisar - " . . . when Troy [Gautreau] came up to me, he said, well, what about if we go south of I-10 into the Pelican Point area.  I said, Troy, I understand we're trying to get numbers that are sending white people to East Ascension because that's what he wanted to talk about. . . . He said, well, can I just run the numbers with Scott [Duplechein].  I said, absolutely.  But I knew in

---

[13] That is precisely what the District has done here.  The School Board states that "Option 2f consists of a flow chart setting out the feeder plan, a set of written descriptions of the attendance zone lines by street boundaries, and a set of maps showing the geographical boundaries of the attendance zones" and directs this court to the School Board's record exhibit K, which conveniently excludes the document displaying the statistical analysis of Option 2f.

No. 09-30971

Pelican Point that there were a lot of African-Americans . . .
."

4.    Deposition of School Board Member Catherine Davis -"Q: . . . the percentage of black[s] . . . at certain schools?  Was that an issue? . . . A: Had to be because there were different plans. Q: So that was really the only difference between the plans, really, was the percentages of - - A: Well, that would make up the plans, right?  Q: Right.  It was where these minorities were going . . . correct?  A: The plan showed where students went.  Q: And those students had labels attached to them such as - - A: Unfortunately, yes."

5.    Deposition of School Board Member Harold Jarreau - "Q: Now, you said it's important for you to see the black, white minority ratios, yes?  A: You have to try and - - you have to try and consider those numbers when you make the move, yeah."

In addition to the referenced deposition testimony and affidavits from the Superintendent and School Board members, the record contains an excerpt from the District's website, posted on November 9, 2007, but later removed, to provide the public with re-districting information.  In it, the School Board indicated that "Students who are currently in the Dutchtown High School feeder line may be bused to the East Ascension High School feeder line to alter the racial balance. . . . We are simply trying to balance the demograph[ics] of East Ascension."

Notwithstanding this body of evidence, the magistrate judge found that "only" 339 students, in a district population of 18,000, were affected by Option 2f. In light of the testimony, this seems to be a group identifiable and identified principally on racial grounds (whether minority or not) for assignment to particular schools.

There are also material questions whether strict scrutiny must apply because evidence viewed in the light most favorable to Lewis supports Lewis's contention that Option 2f was discriminatory in effect.

No. 09-30971

The magistrate judge determined that Option 2f neither has nor will result in a disparate impact on the basis of race. The court's findings were based on a statistical analysis of Option 2f's impact on the three East Bank high schools.[14] Lewis, however, also alleges a disparate impact upon the East Ascension *feeder system*. The evidence shows that Option 2f effected an increase from 46% to 49% in the East Ascension feeder system's percentage of the total number of minority students in the District, while the Dutchtown feeder system's percentage decreased from 37% to 33%, and the St. Amant feeder system's percentage remained at 18%. The East Ascension feeder system's percentage of the total number of at-risk students in the District rose from 40% to 43%, while the Dutchtown feeder system's percentage decreased from 27% to 25%, and the St. Amant feeder system's percentage remained at 32%. These effects occurred even though only 29% of the East Bank student population was enrolled in the East Ascension feeder system, compared to 37% in the Dutchtown feeder system and 34% in the St. Amant feeder system.

---

[14] After Option 2f's implementation, during the 2008–09 school year, East Ascension High School shifted from 41% minority students to 42.2% (and from 34.9% black students to 33.9%), Dutchtown High School shifted from 23.3% minority students to 24.1% (and from 19.6% black students to 20.1%), and St. Amant High School shifted from 11.9% minority students to 14.1% (and from 10.3% black students to 12.6%). Thus, Option 2f effected approximately a 1 to 3 percentage increase in minority population at each of the three high schools, with the largest percentage increase at St. Amant, and a decrease in the percentage of black students at East Ascension. As before Option 2f, East Ascension continued to have approximately twice the percentage of minority students as Dutchtown and three times the percentage of minority students as St. Amant. These percentages seem to reflect the success of the Board's effort to maintain each school's pre-existing racial balance.

After Option 2f, East Ascension High School shifted from 40% at-risk students to 44%, Dutchtown High School shifted from 18% at-risk students to 20%, and St. Amant High School shifted from 24% at-risk students to 28%, a 2 to 4 percentage increase at each of the three schools with East Ascension and St. Amant experiencing the same percentage increase. As was the case before Option 2f, East Ascension continued to have slightly more than twice the percentage of at-risk students as Dutchtown and slightly less than twice the percentage of at-risk students as St. Amant.

No. 09-30971

Importantly, the only school that Option 2f realigned to a different feeder zone, Duplessis Primary, was projected to shift from 38% at-risk in the 2007–08 school year to 43% at-risk in the 2008–09 school year, thereby becoming a Title I-designated school.[15]  Option 2f moved Duplessis Primary from Dutchtown's feeder zone to East Ascension's feeder zone, thereby ensuring that all of the schools in the East Ascension feeder zone would continue to be Title I-designated and that none of the schools in Dutchtown's feeder zone would be so designated. These statistics provide some support for Lewis's contention that Option 2f disproportionately funneled minorities and at-risk students into the East Ascension feeder zone, thereby discriminating against minorities whose educational environments suffer from disadvantages allegedly attributable to high levels of at-risk  children.

Because factual questions exist as to whether Option 2f had both a racially discriminatory motive and a disparate impact, and the court misapprehended the significance of the evidence before it, the court erred in awarding summary judgment under a rational basis test.

## Conclusion

No doubt the district had a responsibility to address overcrowding in Dutchtown High School.  It could not, however, do so by assigning individual students among the schools based upon disadvantaging one race over another in the assignment of at-risk students, even if the motive in doing so is the "benign" motive of "maintaining unitary status."  The standard of review, whether strict scrutiny or rational basis, turns on the factual questions of discriminatory motive and impact.  Therefore, the judgment of the district court is AFFIRMED insofar as it found Lewis's claim against the 2002 Feeder

---

[15] Schools with a Title I designation are those in which low-income children (*i.e.*, "at-risk") make up at least 40% of the enrollment.  These schools are eligible for certain federal funds.

15

No. 09-30971

Modification plan barred by prescription; otherwise, the judgment, including its denial of "standing" for Lewis as to Child A, is **REVERSED and REMANDED**, **AFFIRMED in PART, REVERSED and REMANDED in PART,** for further proceedings.

No. 09-30971

EDITH H. JONES, Chief Judge, concurring:

While I concur in the majority opinion, I believe that Appellant Lewis pursues an additional equal protection claim that we must consider. He challenges the school district's racial gerrymandering of attendance zones to maintain almost the exact racial balance that prevailed in the schools before the district was declared unitary. Indeed, the district court seems to have accepted that this "benign" motive for racial assignments is legally acceptable because the district judge evaluated it on the standard of rational basis review. Without expressing an opinion on what a fully developed evidentiary record might show, I believe we ought to confirm that race-based student assignments undertaken "to preserve unitary status," like other racially motivated government actions, presumptively violate the equal protection clause. Then we must remand this issue for trial.

## A.   Lewis preserved the "racial gerrymandering" argument.

My colleagues limit Lewis's claim to that portrayed in the majority opinion, a claim contesting the disproportionate assignment of at-risk students to the East Ascension feeder system by means of race conscious redistricting. But Lewis also clearly asserted that, by itself, "race was a factor in the creation of the new high school districts." That is, he contended that race-based zoning, even if "facially neutral" and independent of its effects, is unconstitutional. His brief states the issue "whether the District court erred in...concluding...despite competent evidence presented...that race was a factor, that Defendant did not have the requisite intent and that a disproportionate impact did not occur . . . ." Lewis asserted that the Board's "actions since...the adoption of Plan 2f were taken to ensure that East Ascension High School [and its feeder system] would maintain a disproportionately large non-white minority population, leaving the remaining two East Bank schools as predominantly white."

I disagree that vague statements made at oral argument waived this claim. Judge King's opinion asserts, for example, that waiver arises from the

assertion that Lewis's claim does not rest on "the number/percentage of minority students being transferred [to] East Ascension," and the district court "incorrectly assumed that Plaintiff based his cause of action on an increase in the minority population at EAHS." Statements like these simply clarify, correctly, that the appellant does not believe a magic number or percentage of minority students is per se violative of equal protection. What matters is the government's intentional use of racial classifications. Lewis states flatly later in his reply brief that "the actions of racial balancing by the [District] are unconstitutional." This is an issue we cannot avoid.

Finally, it seems to me conclusive that the District's brief describes at length why, in its view, Lewis's claim is not governed by the *Parents Involved* decision of the Supreme Court. The interpretation of *Parents Involved* is the crux of Lewis's contention that the racial balancing of the feeder school lines serving East Ascension is unconstitutional. This is an issue we cannot avoid.

**B.     It is unconstitutional to engage in "racial balancing" in post-unitary status schools for the purpose of maintaining pre-unitary status ratios of minority and non-minority students**.

I preface these comments with a disclaimer that we do not know, at this stage of litigation, that the Board members and administrators who testified that they were concerned with preserving the district's unitary status actually revised the district lines in a racially conscious way to maintain pre-unitary percentages of minority and non-minority students in the schools. We know, however, that such a racial balance was the outcome of the process. A trial on the merits would determine the degree of correspondence between the Board's intent and the result achieved.

The essential problem with the Board's argument is the contention, shared by the magistrate judge and the district court, that maintaining the "racial balance" extant when unitary status was declared is *NOT* an unconstitutional

use of race and thus may be analyzed under the rational basis standard for equal protection claims. A further problem is the misperception that when the desired racial balance is achieved by geographical lines, rather than assignment of specific students of certain races, the action is "facially neutral" and thus also subject to no more than rational basis scrutiny. These errors must be corrected.

In *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 127 S. Ct. 2738 (2007), the Supreme Court required strict scrutiny review of a race-based student assignment decision in a Kentucky school district that had been declared unitary. The Court held that the district's unitary status conferred no discretion, much less an obligation, on the district to continue to assign individual students based on racial criteria. *Id*. at 721, 127 S. Ct. at 2752. It seems clear following *Parents Involved* that, if the Board deliberately aimed at racial balancing as a device to maintain unitary status, this motivation must be tested under strict scrutiny.

The Board distinguishes *Parents Involved* on three bases. First, it relies on cases which all predate *Parents Involved*, (*see* n.__*supra* in majority opinion), and principally analogizes to *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71 (1st Cir. 2004). In *Anderson*, however, the post-unitary district plan removed any racial consideration in school attendance in favor of a 100% "walk zone" preference and adhered to racial diversity merely as a desideratum. Fortuitously, the district's entirely race-neutral plan was estimated to result in approximately the same population diversity in the schools as had existed in a race-conscious, and unconstitutional, Old Plan. *Anderson*, 375 F.3d at 85. The *Anderson* court found the New Plan facially race-neutral for these reasons, noting that it would not "hesitate to apply strict scrutiny review" if the plan had employed "racial classifications for the distribution of benefits...." *Id*.

Here, in contrast to *Anderson*, it is arguable that the Ascension Parish district required its statisticians to draft attendance zone boundaries that would

19

preserve a precise racial balance among the high schools.  The boundaries are only race-neutral because streets are not people.  Streets, though,  may well be racial proxies because the district or its agents apparently knew and used the racial composition of the people living on those streets to pursue racial balancing.

Appellee next distinguishes *Parents Involved* as involving only individual student assignments.  The magistrate judge concurs:  "By contrast, Option 2f, on its face, does not indicate that Dutchtown students were reassigned to the East Ascension school zone based upon their race.  Instead, the reassignment was based upon the geographical location of their residences."  That the boundaries are "facially race-neutral," however, does not necessarily insulate them from strict scrutiny review.  In cases challenging legislative redistricting, the use of racial data to formulate districts can evidence discrimination.  *See, e.g.,  Bush v. Vera*, 517 U.S. 952, 968,  116 S. Ct. 1941, 1953, 1958  (1996).  To allow a school district to use geography as a virtually admitted proxy for race, and then claim that strict scrutiny is inapplicable because "Option 2f designated geographical lines for student assignment with no *mention* of race" is inconsistent with the Supreme Court's holdings.  *See also Hunt v. Cromartie,* 526 U.S. 541, 119 S. Ct. 1545 (1999).  Moreover, the Court has condemned racial balancing, however accomplished, when it is undertaken "to assure...some specified percentage of a particular group merely because of its race or ethnic origin." *Grutter v. Bollinger*, 539 U.S. 306, 329-30, 123 S. Ct. 2325, 2339 (2003) (quoting *Regents of U. of Cal. v. Bakke*, 438 U.S. 265, 307, 98 S. Ct. 2733 (1978)(opinion of Powell, J.).

The third, and most plausible, ground for distinguishing *Parents Involved* is that Justice Kennedy, who provided the fifth vote for the judgment, refused to accept the plurality opinion's rejection of all race-based classifications and noted instead that school boards may pursue

No. 09-30971

the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods . . . . These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible. *See Bush v. Vera . . . .*

551 U.S. at 789, 127 S. Ct. at 2792 (Kennedy, J., concurring) (internal quotation omitted). As one commentator put it, Justice Kennedy's controlling opinion approves the possibility of a school board's adopting generic measures to increase racial diversity in primary and secondary schools. Michelle Renee Shamblin, *Silencing Chicken Little: Options for School Districts After Parents Involved*, 69 La. L. Rev. 219 (2008).

That Justice Kennedy adopted a middle-ground position does not render irrelevant the factual issue raised here. The Justice suggests strict scrutiny review would be "unlikely" if a school board adopts race-conscious boundary lines in order to support diverse K-12 student populations. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 127 S. Ct. 2738 (2007). But the district here does not argue that its re-zoning decisions had anything to do with an interest in fostering diversity as envisioned by Justice Kennedy. He also cites a plurality statement in *Bush v. Vera* expressing the view that, because electoral district lines are "facially neutral," a "searching inquiry" is required to determine whether strict scrutiny governs constitutional review. *Id.*[1] These distinctions, plus his dichotomy between "general" race-conscious measures and individual

---

[1] One goal of Option 2f, eliminating overcrowding in the Dutchtown feeder system, is race neutral, but the law "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern...." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 428 U.S. 252, 265, 97 S. Ct. 555, 563 (1977).

racial stereotyping of students, emphasize the fact-intensive nature of the inquiry that must be made here. *Compare*, *Friends of Lake View Sch. Dist. v. Beebe*, 578 F.3d 753, 761 (8th Cir. 2009) (facially neutral school closing statute judged by rational basis *in absence of any allegations of racial motive*).

Perhaps most pertinent to this case, Justice Kennedy's concurrence adopts the clear statement in *Parents Involved* that once a school district formerly under a desegregation decree has been declared unitary, "[a]ny continued use of race must be justified on some other basis," 551 U.S. at 721, 127 S. Ct. at 2752. If the Ascension Parish Board used geographic lines as a proxy for racial balancing to "maintain unitary status," the plan is explicitly race-based, and the Board's actions fly in the face of *Parents Involved* and require strict scrutiny review.

For these reasons, I would vacate the district court's decision and remand for a trial to determine whether the Board's redistricting effected racial balancing impermissible under strict scrutiny review, even if it occurred for the "benign" but wholly misguided purpose of maintaining the district's unitary status.

No. 09-30971

KING, Circuit Judge, concurring in part and dissenting in part:

In reversing the district court's grant of summary judgment, the majority creates a fact issue where none exists. Plaintiff Darrin Kenny Lewis's only claim on appeal is that the Ascension Parish School Board allocated a disproportionately large number of at-risk students to East Ascension High School and its feeder schools, which adversely impacted the education of minority children at those predominately minority schools. Lewis, however, failed to present any evidence that the Board intended to discriminate against minority students by placing too many at-risk students in their schools. Because Option 2f, the student assignment plan at issue in this appeal, is facially race neutral and there is no evidence that the Board adopted Option 2f with the intent to discriminate against minorities by targeting their schools with an influx of at-risk students, Lewis's claim was properly assessed under a rational basis analysis. Lewis failed to present evidence that the Board acted arbitrarily or irrationally, and thus I would affirm the judgment of the district court dismissing Lewis's claim. I respectfully dissent from the majority's decision to remand this case for further fact-finding on the Board's intent in adopting Option 2f and on whether Option 2f had a racially disparate impact.[1]

Although the only relevant evidence of discriminatory intent would pertain to the desire to discriminate against minorities by sending at-risk children to their schools, the majority finds a fact issue regarding intent based on evidence indicating (1) that the Board did not want to disturb the district's unitary status while addressing the problem of overcrowding and (2) that the Board was aware of the effects Option 2f would likely have on racial demographics and the number of at-risk students assigned to various schools within the district. The desire to

---

[1] I agree with the majority's handling of the issue regarding Lewis's capacity to sue on behalf of Child A. I also agree that Lewis's claims related to the redistricting that occurred in 2002 are barred by the statute of limitations.

maintain unitary status, however, speaks to the racial composition of schools within the district, not the assignment of at-risk students to schools. Thus, this evidence does not pertain to Lewis's sole claim on appeal. Furthermore, the Supreme Court has been absolutely clear that mere awareness of consequences is insufficient to demonstrate discriminatory intent. Thus, the evidence relied upon by the majority is either unrelated to Lewis's claim or insufficient to establish it.

In reaching its decision, the majority engages in additional problematic analysis that has potentially far-reaching consequences and threatens to require the application of strict scrutiny to actions taken with a mere awareness of their effects on racial demographics. The majority suggests that Option 2f classifies students by race because a statistical analysis predicting the impact of Option 2f (and, for that matter, all the other options under consideration) tracked the number of African American and at-risk students expected to attend various schools within the district. However, under Option 2f, the determination of which school a student will attend depends only on where the student lives—not on the student's race. Taking the race of individual students into account when compiling statistics about the probable effects of Option 2f is something very different from assigning individual students to particular schools based on their race. This is a very important distinction, and it is one that the majority fails to make. The majority's expansive take on what constitutes a racial classification likely functions as a push toward the application of strict scrutiny to any governmental action taken with an awareness of its consequences on racial demographics—information often available to decisionmakers in many contexts. Requiring the application of strict scrutiny in such a broad range of circumstances, however, is at odds with Supreme Court precedent holding that discriminatory intent must be shown for strict scrutiny to apply to facially race-

24

neutral acts and that mere awareness of consequences is not enough to demonstrate discriminatory intent.

Chief Judge Jones's concurrence also asserts that Option 2f employs explicit racial classifications, arguing that geography functions as a proxy for race in Option 2f. Whether the Board used geography as a proxy for race, however, is not related to what Option 2f says on its face. An explicit classification must be just that—explicit. Determining whether the Board sought to classify students based on their race and did so using geographical lines as pretext involves analysis of the Board's intent and has no bearing on Option 2f's express terms. That Option 2f is facially race neutral is, in my view, beyond dispute.

The attempts of both the majority and concurring opinions to describe Option 2f as employing explicit racial classifications seem to be geared toward extending the reach of the Supreme Court's decision in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), to decisions involving the mere awareness of an act's probable effects on racial demographics. The majority and concurring opinions also seem to push for the application of strict scrutiny to student assignment plans merely because decisionmakers show some desire not to upset a school district's unitary status. However, if the court were to confine itself to the case before it, the case would not provide an appropriate platform to further either of these ends.

In *Parents Involved*, the Court held that student assignment plans using express racial classifications were not sufficiently narrowly tailored to withstand strict scrutiny. The holding in *Parents Involved* pertains only to plans using explicit racial classifications, and Option 2f is facially race neutral. Consequently, *Parents Involved* does not bear directly on the case before us, and the suggestions to the contrary in the majority and concurring opinions

inappropriately seek to extend the reach of *Parents Involved* and the applicability of strict scrutiny.

To be clear, although in the district court Lewis at one time asserted a claim that the Board impermissibly re-assigned too many minority students to attend East Ascension and its feeder schools, he expressly waived that claim on appeal. Nonetheless, the majority continues to rely on and discuss evidence related to the Board's desire not to disrupt the district's unitary status. Lewis's only claim on appeal, however, relates to the placement of at-risk children in schools and has nothing to do with altering or maintaining racial demographics, whether to preserve unitary status or for any other reason. The only discriminatory intent that matters in this appeal is the desire to engage in racial discrimination through the placement of at-risk children in East Ascension and its feeder schools. Thus, whether the Board intended to avoid significantly altering the racial makeup of its schools is an issue we need not, and should not, address.

## I.    The Nature of Lewis's Claim

In his complaint, Lewis alleged that "the district lines drawn and adopted by the defendant disproportionately pull African American students and economically disadvantaged students from across the east bank and feed them into East Ascension High School." Fairly read, Lewis's complaint challenged two aspects of Option 2f. First, Lewis claimed that the Board impermissibly re-assigned too many minority students to attend East Ascension High School ("East Ascension" or "EAHS"),[2] and second, he claimed that the Board allocated a disproportionately large number of at-risk students to East Ascension and its

---

[2] Lewis's complaint alleged that "[the Board's] actions . . . were taken to ensure that [East Ascension] would become predominantly African American, leaving the remaining two (2) east bank high schools as predominantly white" and that "race was a factor in [the Board's] adoption of Option 2f."

feeder schools, which adversely impacted the education of minority children attending East Ascension, including his children.[3]

On appeal, Lewis clarified, and in fact insisted, that his claim rests solely on the second aspect of Option 2f. In his opening brief,[4] his reply brief, and at oral argument,[5] Lewis contended that at-risk students adversely impact the educational environment at East Ascension, which in turn disparately impacts minority students because East Ascension has the largest proportion of minority students of the three high schools on the east bank. As Lewis himself appears to recognize, the decision to send a student to one school rather than another because of the student's race is distinct from the decision to send at-risk students to a certain school because of the high percentage of minority students at that school. He expressly told this court that his claim rests on the second decision,

---

[3] Lewis alleged that the Board "was aware that the disproportionately large numbers of economically disadvantaged/'at risk' students being allocated to East Ascension High School, and the even larger economically disadvantaged/'at risk' populations at the feeder schools within the East Ascension High School feeder system would ensure that the non-white minority students at East Ascension High School would not, now and in the future, be afforded educational opportunities equal to those available to the students at either Dutchtown High School or St. Amant High School."

[4] "The Plaintiff contends that the vastly disproportionate number of minorities assigned to attend EAHS is the 'suspect class' which is being treated unequally. The cause of this unequal treatment is the placing of an even higher proportion of 'at risk' students into the EAHS school system through the adoption and enactment of Option 2f . . . ." Appellant's Br. at 30–31.

[5] Lewis's counsel made the following statements during oral argument: (1)"What we're saying . . . is that when you take an abnormal number of 'at risk' students and congregate them into a school situation, it has an adverse impact on the other students in that school"; (2)"We say that what's unjust is to congregate the mass of this challenge [the 'at risk' students] into the feeder system and school system that also contains a majority of the minority students"; and (3)"We feel that loading up or putting an abnormal number of 'at risk' students into the same school and school system where the minorities are is a breach of their civil rights."

When asked, Lewis's counsel agreed his claim is that "this plan that's been adopted here takes the 'at risk' students and puts them in the EA feeder pattern and thereby disadvantages minority students." He also agreed that "[t]he aggrieved part[ies are] the minority students, and they are aggrieved because [the Board] put the 'at risk' students with them in a way that disadvantages minority students."

and he no longer asserted any claim based on the first decision. In his opening brief, Lewis began his discussion of the merits of his equal protection claim by stating, "[t]he District Court first incorrectly assumed that Plaintiff based his cause of action on an increase of the minority population at EAHS." Appellant's Br. at 30. In his reply brief, Lewis stated:

> Once again, Appellant urges that the number/percentage of minority students is *not the basis* for the Appellant's cause of action in this matter. The Appellant reasserts that its cause of action exists upon the number/percentage of "at-risk" students being transferred into East Ascension High School and its feeder system . . . . The transfer of this high number of "at-risk" students to the EAHS feeder system is *the action* causing injury to the Appellant, who is a minority at EAHS.

Appellant's Reply Br. at 1–2 (emphasis added). Chief Judge Jones's concurrence asserts that Lewis's claim related to gerrymandering or racial balancing is still before us, indicating that Lewis's statements on appeal merely "clarify, correctly, that the appellant does not believe a magic number or percentage of minority students is per se violative of equal protection." Jones Concurrence at 2. To the contrary, because Lewis stated that "the number/percentage of minority students is not the basis for the Appellant's cause of action in this matter," we can only fairly assume that Lewis meant exactly what he said: "the number/percentage of minority students is not the basis for the Appellant's cause of action in this matter." Thus, the majority opinion is correct when it says that the only claim at issue is whether the Board violated the Lewis children's right to equal protection by assigning a disproportionate number of at-risk students to East Ascension and its feeder schools.

## II.    Assignment of At-Risk Students to East Ascension

Having established that Lewis claims only that a disproportionate number of at-risk children were assigned to East Ascension and its feeder schools under Option 2f, I turn to the merits of that claim. Lewis's only argument on appeal

with respect to the merits of his equal protection claim is that the district court erred by failing to apply strict scrutiny to the Board's adoption of Option 2f. He contends that Option 2f is automatically subject to strict scrutiny because it employs racial classifications and, alternatively, that he produced sufficient evidence that the Board acted with a discriminatory motive in assigning a disproportionate number of at-risk students to East Ascension. The district court held that the Board's decision was subject to rational basis review because Option 2f is facially race neutral and Lewis had not carried his burden to present evidence that the Board acted with a discriminatory purpose. I agree. We should review the Board's decision for a rational basis, and because Lewis presented no evidence that the decision was arbitrary or irrational, I would affirm the district court's grant of summary judgment in favor of the Board.

## A.    Level of Scrutiny

The touchstone in the analysis of any racial discrimination claim is a determination of whether the government acted with "a racially discriminatory intent or purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Washington v. Davis*, 426 U.S. 229, 239–40 (1976). If the government has acted with such a purpose, we apply strict scrutiny and examine whether the law is narrowly tailored to further a compelling governmental interest. *See Grutter v. Bollinger*, 539 U.S. 306, 326–27 (2003). If the government did not act with such a purpose, we review its decision for a rational basis. *Id.*

"No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute," *Shaw v. Reno*, 509 U.S. 630, 642 (1993), or when the law is "unexplainable on grounds other than race," *Village of Arlington Heights*, 429 U.S. at 266. However, when a racial classification does not appear on the face of the statute, we must conduct a more searching inquiry into the intent of the lawmakers. Strict scrutiny will be

applied only if the plaintiff can demonstrate that the government acted with a discriminatory motive. *See Vill. of Arlington Heights*, 429 U.S. at 266. Thus, at the outset, we must determine whether we ought automatically to apply strict scrutiny because Option 2f is facially race conscious, or whether we must conduct a more searching inquiry into the Board's intent.

1. *Option 2f is Facially Race Neutral*

Option 2f is facially race neutral and not automatically subject to strict scrutiny for two reasons. First, Lewis challenges only the aspect of Option 2f that assigned additional at-risk students to East Ascension. The decision to assign at-risk students to attend a particular school is race neutral on its face. At-risk students are not a protected class, and the students categorized as at-risk are not limited to a particular race or ethnicity. Option 2f also does not on its face require at-risk students to attend a school with a particular racial makeup.

Second, even examining Option 2f as a whole, the student assignment plan is race neutral. Option 2f is a school assignment plan that tells students where they will attend school based on where their residence is located. Option 2f does not on its face implicate the race of the students. Under Option 2f, if a new family moves into the East Ascension attendance zone, the children will attend East Ascension regardless of race or socio-economic class. Race is simply not a factor in the assignment of students.

Cases in which the Supreme Court has considered the validity of legislative redistricting provide an apt analogy. The Court has consistently stated that the redistricting of legislative districts is facially race neutral, and that a more searching inquiry must be made into the intent of the redistricting body before strict scrutiny will be applied. *Bush v. Vera*, 517 U.S. 952, 958 (1996) (plurality opinion) ("Electoral district lines are 'facially race neutral,' so a more searching inquiry is necessary before strict scrutiny can be found

applicable in redistricting cases than in cases of 'classifications based explicitly on race.'" (citation omitted)); *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999) ("Districting legislation ordinarily, if not always, classifies tracts of land, precincts, or census blocks and is race neutral on its face."); *Shaw*, 509 U.S. at 646 ("A reapportionment statute typically does not classify persons at all; it classifies tracts of land, or addresses."). Moreover, the Court has indicated that legislative districts may be drawn with an awareness of racial demographics without triggering strict scrutiny. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995) ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process."); *Shaw*, 509 U.S. at 646 ("[R]edistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination."); *Bush*, 517 U.S. at 1001 (Thomas, J., concurring) ("We have said that impermissible racial classifications do not follow inevitably from a legislature's mere awareness of racial demographics.").

Despite the fact that Option 2f does not even mention race on its face, the majority seems to suggest that Option 2f employs racial classifications. *See* Maj. Op. at 14 (stating that the students affected by Option 2f "seem[] to be a group identifiable and identified principally on racial grounds (whether minority or not) for assignment to particular schools"). To do this, the majority points to a chart that details the demographic projections under each of the plans considered by the Board (the "Statistical Analysis") and suggests that this analysis should be considered part of Option 2f. *See* Maj. Op. at 12 ("The School Board insists that the Statistical Analysis underlying Option 2f—submitted by Lewis in opposition to summary judgment—does not constitute Option 2f itself.

But to accept that self-serving, summary allegation would be to allow a school district to skew reality simply by selectively including documents in the record and labeling only those documents its 'plan.'"). This chart, which is not part of Option 2f, provides the total expected enrollment for *each plan* in each school and lists the percentage of African American students and the percentage of students that are expected to receive a free or reduced price lunch (i.e., at-risk students). If Option 2f facially classified students based on race, however, strict scrutiny would automatically apply. The majority does not hold that this is the case and leaves the level of scrutiny to be determined by the district court.

Nonetheless, the majority states that "it is unclear how a student assignment plan could calculate the percentage of black students at each school *without* classifying *individual* students by race." Maj. Op. at 12. In making this statement, the majority appears to condemn the Board for even creating such a chart. But the document does no more than show that the Board was *aware* of the demographic implications of each plan, and the Supreme Court has never held that a mere awareness of a student's race is automatically subject to strict scrutiny, much less unconstitutional. *Cf. Shaw*, 509 U.S. at 646; *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences."). A compilation of demographic information, even racial demographic information, does not by itself suggest a racial classification or a facially race-conscious decision.

Instead, to subject its decision to strict scrutiny, the government must use that demographic information to take action affecting the plaintiff. In every case in which the Court has applied strict scrutiny to a "racial classification," a racial preference or classification appeared on the face of the government decision *and* required that action be taken with respect to an individual based on the classification. *See Parents Involved*, 551 U.S. at 720 (school district used

32

race to determine whether students would be assigned to their school of choice); *Johnson v. California*, 543 U.S. 499, 502–05 (2005) (state prison used race to determine where inmates would be housed); *Gratz v. Bollinger*, 539 U.S. 244, 254, 270 (2003) (university awarded admissions "points" to minority applicants); *Grutter*, 539 U.S. at 314, 326 (law school used applicant's race as one factor in admissions process); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 205 (1995) (government gave contractors a financial incentive to hire minority subcontractors); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 477–78, 493–94 (1989) (city mandated that a certain percentage of construction contracts would be awarded only to minority contractors); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 271, 273–74 (1986) (school laid off nonminority teachers to achieve racial balance between faculty and students); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 272–73, 290, 357 (1978) (medical school set aside a specified number of spots in the entering class for minority students only); *see also Walker v. City of Mesquite*, 169 F.3d 973, 980–81 (5th Cir. 1999) (declaring invalid city's decision to build public housing units in "predominantly white areas"); *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998) ("The term [racial classification] normally refers to a governmental standard, preferentially favorable to one race or another, *for the distribution of benefits*." (emphasis added)).  None of these cases stands for the proposition that the government's awareness of race, and the racial demographics of neighborhoods or schools, is a racial classification automatically subject to strict scrutiny.

The Statistical Analysis does not on its face suggest that the Board actually used the document to decide which plan to adopt or that the Board considered race when it undertook to redistrict the attendance zones.  For that conclusion, the majority must look to other evidence in the record, such as the deposition testimony of various Board members.  Maj. Op. at 12–13.  Because Option 2f is facially race neutral, we must review the record to determine

whether Lewis presented sufficient evidence that the Board acted with a discriminatory motive when it adopted Option 2f.

Before examining the intent of the Board, I note briefly that Chief Judge Jones's concurrence goes one step further than the majority opinion to mischaracterize the nature of Option 2f.  The concurrence suggests that, in assessing whether Option 2f is *facially neutral*, it is proper to look behind the face of Option 2f and assess whether any way in which the plan expressly classifies students is actually a proxy for race.  *See, e.g.*, Jones Concurrence at 3–4 ("A further problem is the misperception that when the desired racial balance is achieved by geographical lines, rather than assignment of specific students of certain races, the action is 'facially neutral' . . . ."); *id.* at 5 ("The boundaries are only race-neutral because streets are not people.  Streets, though, may well be racial proxies because the district or its agents apparently knew and used the racial composition of the people living on those streets to pursue racial balancing."); *id.* at 2 ("What matters is the government's intentional use of racial classifications.").  However, it seems inescapable that a "facial" or "explicit" category would have to be expressed on the face of Option 2f.  The inquiry regarding the level of scrutiny does not end with an examination of the face of Option 2f, but the inquiry regarding the explicit classifications Option 2f employs does.  Examination of the intent behind the adoption of Option 2f involves a separate analysis.

2.    *Lewis Has Not Shown that the Board Had a Discriminatory Motive in Assigning At-Risk Students to East Ascension*

Although Option 2f is facially race neutral, it nevertheless may be subject to strict scrutiny if the Board adopted the plan with a discriminatory purpose. *See Vill. of Arlington Heights*, 429 U.S. at 265–66.  The majority focuses its attention on whether Lewis presented sufficient evidence that the Board acted with discriminatory motive in re-assigning students based on the race of those

students. As I have repeated, Lewis does not challenge that aspect of Option 2f. The only relevant issue is whether the Board acted with a discriminatory purpose or motive when it assigned additional at-risk students to East Ascension.

In *Village of Arlington Heights*, the Supreme Court set forth a now-familiar test by which we are to determine whether "there is a proof that a discriminatory purpose has been a motivating factor in [a facially neutral government decision]." *Id.* at 265–66. The Court held that disproportionate impact is but one factor which a plaintiff can use to support a finding of discriminatory purpose. *Id.* at 265; *see also Washington*, 426 U.S. at 242. The plaintiff must also prove that the disproportionate impact is traceable to a discriminatory purpose. *Washington*, 426 U.S. at 242 ("Standing alone, [disproportionate impact] does not trigger the rule . . . that racial classifications are to be subjected to the strictest scrutiny . . . ." (citation omitted)); *see also Sonnier v. Quarterman*, 476 F.3d 349, 368 (5th Cir. 2007) ("Even if a neutral law has a disproportionately adverse impact, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." (internal quotation marks, alteration, and citation omitted)). The Supreme Court identified the following additional factors as relevant in determining whether purposeful discrimination animated a particular action:

> (1) whether a clear pattern of discrimination emerges from the effect of the state action; (2) the historical background of the decision, which may take into account any history of discrimination by the decisionmaking body; (3) the specific sequence of events leading up [to] the challenged decision, including departures from normal procedures; and (4) the legislative or administrative history of the state action, including contemporary statements by decisionmakers.

*Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007) (citing *Vill. of Arlington Heights*, 429 U.S. at 266–68).

No. 09-30971

The crux of Lewis's argument that the Board acted with discriminatory intent is that the assignment of additional at-risk students under Option 2f had a disproportionate impact on the minority students attending East Ascension. Lewis offers the following statistics to support his claim that Option 2f had a disproportionate impact on minority students. Prior to the redistricting under Option 2f, approximately 43 percent of the students enrolled at East Ascension were "at risk." At Dutchtown High School ("Dutchtown") the at-risk population was approximately 19 percent, and at St. Amant High School ("St. Amant") the at-risk population was approximately 24 percent.[6] Without any redistricting, the Board projected that those numbers would rise to 61 percent, 27 percent, and 36 percent, respectively, by the beginning of the 2012 school year. Under Option 2f, the Board projected that the percentage of at-risk students at East Ascension would decrease slightly for the first year that the redistricting was in effect and rise more slowly than without redistricting. By the 2012 school year, East Ascension was projected to have 57 percent at-risk students under Option 2f, Dutchtown was projected to have 26 percent, and St. Amant was projected to have 36 percent. In addition, the proportion of minority students at East Ascension was projected to be lower under Option 2f than without any redistricting—47 percent by 2012 under Option 2f compared to 51 percent under the then-current plan.

After examining these statistics and the rest of the record, I am frankly perplexed at Lewis's contention that Option 2f disproportionately impacted East

---

[6] The record contains two charts with demographic information regarding each plan. Because we must construe the evidence in the light most favorable to Lewis at this stage, I refer to the chart showing the greatest percentage of at-risk students. I also note that these percentages are slightly different from those referred to in the majority's opinion. *See* Maj. Op. at 14 n.14. The majority appears to analyze the demographic shift, or lack thereof, *after* the implementation of Option 2f. Because we are concerned with the Board's intent in adopting Option 2f, the more appropriate evidence on this point is the information the Board was actually presented with *before* it made its decision.

36

No. 09-30971

Ascension. It is true that East Ascension received more at-risk students under Option 2f, but East Ascension was going to receive more students under any redistricting plan. The undisputed evidence suggests that East Ascension was under-enrolled at the time of the redistricting and was the high school in the best position to relieve the overcrowding in the Dutchtown feeder system. Thus, additional students were going to attend East Ascension regardless of whether those students were "at risk," minority, or non-minority students. And under Option 2f, the proportion of at-risk students with respect to the entire student population actually *decreased* compared to the projected at-risk enrollment had the Board taken no redistricting action.

Even if Lewis could demonstrate that the assignment of at-risk students to East Ascension under Option 2f had a disproportionate impact, he has not demonstrated that the Board acted with a discriminatory purpose. Lewis makes little effort to demonstrate discriminatory intent under any of the *Village of Arlington Heights* factors. Instead, he simply argues that the Board *must* have acted with a discriminatory intent because it was aware of the racial demographics when it assigned additional at-risk students to attend East Ascension. But discriminatory intent "implies more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279. "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Lewis must therefore demonstrate that the Board adopted Option 2f *because of* its disproportionate impact, not merely that the Board was aware of its impact.

Lewis argues that the addition of two "Title I"[7] elementary schools to the East Ascension feeder system is evidence of discriminatory intent because the

---

[7] A "Title I" school is a school that is eligible to receive additional federal funds due to the large proportion of low-income or "at risk" students.

Board did not add the schools to the Dutchtown or St. Amant feeder systems. The two schools to which Lewis refers are Duplessis Elementary and Pecan Grove Elementary. Pecan Grove is a new school, and the record contains no evidence that the at-risk students who will attend Pecan Grove did not previously attend another East Ascension elementary school. However, it is undisputed that Duplessis was transferred from Dutchtown to East Ascension under Option 2f. Lewis presented evidence that the Board considered at least one redistricting option under which Duplessis would remain assigned to Dutchtown and Prairieville, a new elementary school that was not projected to be a Title I school, would be assigned to East Ascension instead of Dutchtown. The record suggests that the Board was well aware that the Duplessis option would cause a high number of at-risk children to be assigned to East Ascension and that at least one Board member expressed concern about the transfer.

While the record indicates that the Board members were aware of the impact that the Duplessis option, which became Option 2f, would have on the students at East Ascension, there is no evidence that the Board chose the Duplessis option *because of* its effect on the East Ascension minorities. Lewis does not argue that the Board's decision to assign Duplessis to East Ascension was so abnormal that racial discrimination must have been a motivating factor. The District map indicates that the Duplessis attendance zone is geographically contiguous with the larger East Ascension attendance zone, and none of the attendance zones is so oddly shaped that it facially indicates any inappropriate gerrymandering. In fact, Lewis does not even argue that the Board ought to have adopted the Prairieville option over the Duplessis option, or that the Board had any other choice than the Duplessis option that would have solved the overcrowding issue at all of the schools. In essence, it appears that Lewis would like the Board to redraw *all* of the attendance zones in the entire District to balance the at-risk children among the three high schools, which would be

contrary to the Board's undisputed goal of reassigning no more students than absolutely necessary. Lewis has not created a genuine issue of fact for trial regarding the Board's motive because he utterly failed to connect the Board's awareness of the racial demographics at East Ascension with the Board's decision to assign additional at-risk students to East Ascension.

The majority makes much of the evidence that Lewis presented that suggests the Board was aware of the race of individual students when it re-zoned the schools. Specifically, the majority focuses on the deposition testimony of several Board members that they had a desire to maintain unitary status and to preclude increasing the percentage of minority students at East Ascension. The majority also points to a statement on the Board's web site that the Board was "simply trying to balance the demograph[ics] of East Ascension." However, this evidence does not even speak to whether the Board acted with an intent to discriminate through the disproportionate placement of at-risk students in schools attended predominantly by minorities. Thus, this evidence is insufficient to raise questions about the level of scrutiny that applies.

## B.    Lewis's Claim Fails Under Rational Basis Review

We need not apply strict scrutiny because Lewis presented insufficient evidence that the Board acted with discriminatory purpose or had a discriminatory motive when it assigned at-risk students to the East Ascension feeder system. Accordingly, we should examine the Board's decision to determine whether the Board had a rational basis for assigning the students to East Ascension. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Under rational basis review, "a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," and the burden is on the challenger to "negative every conceivable basis which might support [the classification]." *Heller v. Doe*, 509 U.S. 312, 320–21 (1993) (citations and internal quotation marks omitted).

39

No. 09-30971

Lewis has presented no evidence or argument that the Board did not have a rational basis for assigning at-risk students to attend East Ascension. Indeed, my review of the record indicates that Option 2f may have in fact been the most practical option. The "Prairieville Option" and "Option 3" are the only plans considered by the Board that would have resulted in a lower percentage of at-risk students assigned to East Ascension. Evidence in the record indicates that under the "Prairieville Option," the percentage of at-risk students in East Ascension was projected to be 46 percent by 2012, 11 percent lower than the projection under Option 2f. But under this option, the enrollment at East Ascension would increase from approximately 1,200 students to over 2,000 students, far more students than either of the other two high schools. Under Option 3, the at-risk percentage would be 55 percent by 2012, just two percent lower than the projected at-risk percentage under Option 2f. And according to the enrollment projections for Option 3, Dutchtown would still have far more students than East Ascension, which would not alleviate the overcrowding issue at Dutchtown.

Because Lewis has not met his burden to prove that the Board had no rational basis to assign additional at-risk students to East Ascension, I would affirm the district court's grant of summary judgment in favor of the Board.

## III.  Awareness of Consequences, Option 2f, and *Parents Involved*

The majority criticizes the "assumption that it might be justifiable to use racially-based decisions for the 'benign' purpose of maintaining post-unitary 'racial balance' among the schools in the system" as being "at least in tension with the Supreme Court's decision in *Parents Involved*." Maj. Op. at 11. The majority's attempt to relate the instant case to *Parents Involved* is troubling for several reasons. Critically, any claims Lewis may have had related to assigning

40

No. 09-30971

students to schools based on race are not before us. Thus, the notion of racial balancing need not, and should not, enter into our analysis.

Further, the holding in *Parents Involved* pertained only to plans that expressly use race to determine which school a student will attend and thus does not speak to the matter before us. The plurality opinion makes clear that the plans in *Parents Involved* used "explicit racial classifications" and that "other means for achieving greater racial diversity in schools . . . implicate different considerations." *See* 551 U.S. at 745; c*f. Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 104 (4th Cir. 2011) (stating that *Parents Involved* pertained to strict scrutiny analysis of race-based school assignments and "has little bearing" on a case subject to a lesser degree of scrutiny). In *Parents Involved*,

> school districts . . . adopted student assignment plans that rely upon race to determine which public schools certain children may attend. The Seattle school district classifies children as white or nonwhite; the Jefferson County school district as black or "other." In Seattle, this racial classification is used to allocate slots in oversubscribed high schools. In Jefferson County, it is used to make certain elementary school assignments and to rule on transfer requests. In each case, the school district relies upon an individual student's race in assigning that student to a particular school, so that the racial balance at the school falls within a predetermined range based on the racial composition of the school district as a whole. Parents of students denied assignment to particular schools under these plans solely because of their race brought suit, contending that allocating children to different public schools on the basis of race violated the Fourteenth Amendment guarantee of equal protection.

551 U.S. at 709–11. Thus, the plans in *Parents Involved* used race as a deciding factor in determining which school a student would attend, whereas Option 2f is facially race neutral and bases the determination of where children will attend school on where they live, not on their race. This is not a *Parents Involved* case.

41

No. 09-30971

Moreover, the Court in *Parents Involved* did not, as the majority suggests, broadly hold that "preserving the district's unitary status by means of racially-based assignments, albeit a 'benign' racial motive, was nevertheless constitutionally impermissible." *See* Maj. Op. at 11. The holding in *Parents Involved* is far narrower than the majority's description indicates. The plans at issue in *Parents Involved* were deemed unconstitutional because they were not sufficiently narrowly tailored to withstand strict scrutiny. *See Parents Involved*, 551 U.S. at 735; *id.* at 786–87 (Kennedy, J., concurring). The Court faulted the plans for their broad-brush, binary concept of race, as well as the failure to give "serious, good faith consideration of workable race-neutral alternatives," as narrow tailoring requires. *See id.* at 735 (internal quotation marks and citation omitted); *see also Fisher v. Univ. of Tex. at Austin*, 631 F.3d 213, 246 (5th Cir. 2011) ("*Parents Involved* was primarily a critique of the school districts' extreme approach that used binary racial categories to classify schoolchildren." (internal quotation marks and citation omitted)).

Justice Kennedy, who provided the fifth vote in the five-to-four *Parents Involved* decision, specifically disagreed with the "all-too-unyielding insistence that race cannot be a factor in instances when . . . it may be taken into account." *Parents Involved*, 551 U.S. at 787 (Kennedy, J., concurring). According to Justice Kennedy:

> In the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race.

42

No. 09-30971

*Id.* at 788–89 (Kennedy, J., concurring) (citation omitted); *see also Fisher*, 631 F.3d at 246 ("The Court [in *Parents Involved*] did not hold that a *Grutter*-like system would be impermissible even after race-neutral alternatives have been exhausted . . . . To the contrary, Justice Kennedy . . . wrote separately to clarify that a more nuanced, individual evaluation . . . . informed by *Grutter* would be permissible . . . ." (internal quotation marks and citation omitted)); *Hart v. Cmty. Sch. Bd. of Brooklyn*, 536 F. Supp. 2d 274, 282 (E.D.N.Y. 2008) ("The deciding opinion of Justice Kennedy [in *Parents Involved*] . . . allows for the use of race as one admission factor among others."). In addition, Justice Breyer's dissent, in which Justices Stevens, Souter, and Ginsburg joined, indicates the facially race-conscious plans at issue both served the compelling interest of "promoting or preserving greater racial 'integration' of public schools" and were narrowly tailored to achieve that end. *See Parents Involved*, 551 U.S. at 837–38 (Breyer, J., dissenting). Thus, at least five justices in *Parents Involved* endorsed the view that promoting diversity in elementary and secondary schools may be a compelling governmental interest. Consequently, it is clear that the Court in *Parents Involved* did not broadly condemn all student assignment plans that facially account for race, let alone prohibit all decisionmaking that merely takes place in light of some awareness of racial impact.

As I discussed above, the majority appears to suggest that Option 2f does classify students by race, thereby presumably bringing it closer to the ambit of *Parents Involved*. Importing the background analysis of the expected impact of the plan into the plan itself, however, is wholly inappropriate.[8] The fact remains

_____

[8] The Jones concurrence's insistence that Option 2f is facially race conscious because the geographical categories it employs are proxies for race appears to be a similarly problematic attempt to bring this case within the reach of *Parents Involved*. *See* Jones Concurrence at 8 ("If the Ascension Parish Board used geographic lines as a proxy for racial

No. 09-30971

that—unlike the plans in *Parents Involved*—Option 2f does not provide any mechanism to assign a student to a particular school based on that student's race. That individual students may have been classified for the purpose of assessing the effect of student assignment plans on demographics is something very different from actually assigning individual students to particular schools on the basis of their race. The majority's attempt to define Option 2f in a manner divorced from what it actually says and does has potentially far-reaching consequences and moves toward an inappropriately high level of scrutiny whenever there is some consideration—or perhaps merely awareness—of the effects actions have on racial composition. However, as Justice Kennedy notes:

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; *drawing attendance zones with general recognition of the demographics of neighborhoods*; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible. Executive and legislative branches, which for generations now have considered these types of policies and procedures, should be permitted to employ them with candor and with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races. Assigning to each student a personal designation according to a crude system of individual

balancing to 'maintain unitary status,' the plan is explicitly race-based, and the Board's actions fly in the face of *Parents Involved* and require strict scrutiny review."); *Parents Involved*, 551 U.S. at 745 (plurality opinion) (describing *Parents Involved* as a case involving "explicit racial classifications").

racial classifications is quite a different matter; and the legal analysis changes accordingly.

*Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring) (emphasis added) (internal quotation marks and citations omitted).

By blurring the line between awareness of the consequences of Option 2f and how Option 2f actually assigns students to schools, the majority opinion seems to be taking a step toward requiring that strict scrutiny apply to any action in which effects on race were known or considered. Such a push toward strict scrutiny, however, is contrary to the law. *See Hunt*, 526 U.S. at 546 ("A facially neutral law . . . warrants strict scrutiny only if it can be proved that the law was motivated by a racial purpose or object, or if it is unexplainable on grounds other than race." (internal quotation marks and citations omitted)); *Feeney*, 442 U.S. at 279 ("Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." (footnote, internal quotation marks, and citation omitted)); *see also Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring); *Friends of Lake View Sch. Dist. Inc. No. 25 v. Beebe*, 578 F.3d 753, 761–63 (8th Cir. 2009) (applying a rational basis analysis to uphold a facially race-neutral law despite an alleged awareness of the act's disproportionate impact on minorities). Consequently, I disagree with both the reliance on *Parents Involved*, as well as the suggestion that Option 2f classifies students by race.

————

The district court properly concluded that Lewis's claim—that the Board engaged in unconstitutional discrimination when it re-assigned additional at-risk students to East Ascension and its feeder schools—is assessed under a

45

No. 09-30971

rational basis analysis.  Because Lewis has not demonstrated that the Board acted irrationally by adopting Option 2f, I would affirm the district court's judgment in favor of the Board.